

**O**
**JS-6**

# United States District Court
# Central District of California

KENNETH COLLINS,

                Petitioner

     vs.

UNITED STATES OF AMERICA,

         Respondent.

Case № 2:19-cv-10116-ODW

    2:18-cr-00038-ODW-1

**ORDER DENYING DEFENDANT'S MOTION PURSUANT TO 28 U.S.C. § 2255 TO CORRECT, VACATE OR SET ASIDE HIS SENTENCE.[137]**

## I. INTRODUCTION

Defendant and Petitioner Kenneth Collins, ("Defendant", "Petitioner" or "Collins") was an agent of, and public official employed by, the County of Los Angeles and the Los Angeles County Sheriff's Department ("LASD") as a deputy sheriff.  In 2014, Collins met Valencia through the Emerging Leaders Academy, a life-skills class funded at least in part by LASD. Collins was an instructor, and Valencia was a student. The purpose of the Emerging Leaders Academy was for LASD deputies, like Collins, to

teach and mentor adult ex-offenders, like Valencia, in order to help them successfully reintegrate into society.  (PSR ¶10.)

Beginning on August 2, 2017, and continuing until January 16, 2018, Collins, a 16-year veteran deputy sheriff, offered to assist what he believed was a drug trafficking operation in exchange for cash payments. During a recorded meeting on August 2, 2017, Collins began negotiating with an undercover FBI Special Agent ("UC-1"), who was posing as a co-conspirator of a wealthy Asian investor willing to finance the production, distribution, and sale of controlled substances. During multiple recorded conversations, Collins claimed to run "teams" of co-conspirators, including other law enforcement officers, who provided security for illegal marijuana grow houses and drug transports.  Collins offered to recruit and employ a team to assist UC-1 with transporting controlled substances.    During a recorded meeting on August 25, 2017, Collins and Easter met UC-1 to discuss how Collins, Easter, and others could provide security for an illegal marijuana grow house UC-1 was purportedly trying to establish. Collins and Easter also offered to assist UC-1 with transporting and distributing controlled substances.    In Easter's presence, Collins showed UC-1 his LASD badge and a firearm Collins was carrying in his waistband. Collins displayed his LASD badge and firearm to prove to UC-1 that Collins was, in fact, a law enforcement officer, thereby rendering his drug security and transportation services to UC-1 more valuable. In addition, Easter falsely represented that he too was a law enforcement officer, in an effort to entice UC-1 to pay Collins and Easter for their drug security services.  Easter believed that UC-1 was more likely to pay money for his and Collins' security services if UC-1 thought that Easter was also a law enforcement officer.

Toward the end of this meeting, Collins accepted $5,000 in cash hidden inside of a magazine from UC-1 as a good faith payment for future dealings together with Easter. (PSR ¶¶12-15.)

On October 6, 2017, Collins and UC-1 met during a recorded meeting to discuss a "test run" sale of marijuana, whereby UC-1 would buy two pounds of marijuana from Collins. If the "test run" went well, Collins understood that UC-1 planned to purchase greater quantities of marijuana from Collins in the future. During a recorded meeting on October 13, 2017, Collins agreed to sell two pounds of high-quality marijuana to UC-1 for $6,000. If this "test run" went well, Collins offered to facilitate the sale of up to 2,000 pounds of marijuana for $2,000 per pound -- that is, up to $4 million worth of marijuana -- every month to UC-1. On October 20, 2017, Easter delivered approximately two pounds of marijuana to an undercover FBI Special Agent ("UC-2"), who was posing as a drug trafficker working with UC-1. This was the "test run" sale of marijuana that Collins previously negotiated with UC-1. Easter was aware that he was delivering marijuana. Shortly after the delivery, Collins accepted $6,000 in cash from UC-1 as payment for the marijuana that Easter had just delivered to UC-2. During a recorded meeting on October 6, 2017, Collins offered to provide UC-1 with security for an upcoming transport of controlled substances to Las Vegas, Nevada.  Collins demanded $25,000 for his services.  Collins justified the $25,000 price tag by saying that he and his team were "cops" and "all of our transports make it through." (PSR ¶¶17-20.)

On January 5, 2018, Collins and UC-1 met again to discuss details for the transport scheduled to take place on January 16, 2018.  During the recorded meeting, UC-1 told Collins that the cargo would contain 20 kilograms of cocaine, six kilograms of methamphetamine, and cash.  Collins said that his "guys" are used to

providing security for "bigger loads" and asked UC-1 about the possibility of doing even larger drug transports in the future. Collins and UC-1 then discussed increasing the size of the January 16, 2018, transport and filling a "moving truck."  Collins told UC-1 that his price tag, in light of the greater drug quantity, would increase to as much as $250,000. UC-1 ultimately agreed, saying that he (UC-1) could pay Collins $40,000 at the start of the transport, $35,000 once the transport made it safely to Las Vegas, and the remaining "charge for the bigger load" at a later date.  Collins agreed and said that this new plan for a larger transport would be "better." The following day, on January 6, 2018, Collins had a telephone call with UC-1 to finalize plans for the January 16, 2018, transport.  During the recorded call, UC-1 again told Collins that the cargo would consist of "meth and coke," a reference to methamphetamine and cocaine. Collins confirmed that the price for his team's services would be "two dollars and fifty cent[s]," meaning $250,000 as previously negotiated with UC-1.   Sometime around December 2017 or January 2018, Collins enlisted Valencia's assistance for the January 16, 2018, transport.  Valencia agreed to assist with the transport and believed that the cargo would contain marijuana. Collins told Valencia to rent a car for the day of the transport, which he did.

Early in the morning on January 16, 2018, Collins, Easter and Valencia drove in separate cars and met in the Pasadena area for the purpose of providing security for a transport of controlled substances to Las Vegas. As instructed by Collins, Valencia drove a rental car that morning.  Once UC-1 called Collins and informed him of the specific meeting location (the Rosemont Pavilion in Pasadena), Collins, Easter and Valencia then drove to the Rosemont Pavilion. Collins and Easter were aware that the transport vehicle contained at least 20 kilograms of cocaine, six grams of methamphetamine and cash, as had been previously negotiated.  Once they arrived,

Collins, Easter and Valencia each drove their cars into the parking area of the Rosemont Pavilion.  Collins got out of his car, and met with UC-1.  Collins accepted $40,000 in cash from UC-1, as a first installment of the agreed-upon $250,000 payment.  Similar to the November transport, Collins and Easter planned to provide security by driving near or around the transport vehicle to scout for law enforcement and other potential threats. Instead of riding in the transport vehicle, this time Valencia also planned to drive near or around the transport vehicle to scout for law enforcement and other potential threats.  If it appeared that a law enforcement officer might conduct a traffic stop of the transport vehicle, Collins, Easter and/or Valencia planned to drive erratically to capture the attention of the law enforcement officer, thereby causing the law enforcement officer to conduct a traffic stop of one of their cars instead of the transport vehicle.   For this transport, Collins possessed his LASD deputy badge and LASD identification card in the car he had driven to the Rosemont Pavilion. Collins further possessed, in that car, a firearm, namely, a loaded Smith and Wesson, Model MP 9 Shield, nine millimeter semi-automatic handgun, serial number HNX5846. Collins possessed the firearm that day at least in part to provide security for the drug transport.  Just prior to the transport proceeding, law enforcement officers arrested Collins, Easter and Valencia.  (PSR ¶¶ 28-35.)

## II.    LEGAL HISTORY

On January 10, 2018 a Complaint was filed against Collins, Easter and Valencia charging Conspiracy to Distribute Controlled Substances, in violation of 21 U.S.C.§ 846.  [DE-1.]

On January 26, 2018 the 2017 Grand Jury returned a three-count indictment against Collins, Easter and Valencia, charging Collins with Conspiracy to Distribute Methamphetamine, Cocaine and Marijuana in violation of. [DE-31.]  On August 13,

2018 Collins plead guilty to Count 1, Conspiracy, pursuant to a written plea agreement. [DE-78.] That agreement was neither an 11(c)(1)(C) nor cooperation agreement. The relevant provisions of that agreement will be discussed in greater detail below. Collins' guidelines sentencing range was 210-262. [DE-110:3.] He was ultimately sentenced to 210 months. [DE-125.].

### III.     COLLATERAL CHALLENGE TO THE SENTENCE

On November 26, 2019 Collins filed the instant motion under 28 U.S.C. §2255. [DE-137.] Collins claims his counsel was incompetent or ineffective in a number of respects, each of which negatively impacted the outcome of his case by inducing him to plead guilty. As the government's papers amply demonstrate, Collins is unable to show inadequate assistance of counsel, as a matter of law. In addition, he is unable to show prejudice. Had he not entered into the plea agreement, he was facing a mandatory minimum sentence of 20 years. But under the agreement, the government indicated it would dismiss two (2) 924(c) charges, each of which added a mandatory consecutive 5 year term. Again, it should be noted that all of the discussions which established the conspiracy were largely established by recorded conversations and circumstantially by the active participation of Easter and Valencia. Had Collins not agreed to the plea and gone to trial, he likely would have been convicted and lost the benefit of the dismissal of the 924(c) charges. As a factual matter, the evidence of his guilt was overwhelming and his claims of inadequate assistance of counsel simply do not withstand scrutiny. They are as follows:

1.     His attorney failed to communicate to the government that he wished to enter into a cooperation plea agreement.

2.     The defendant's trial counsel was ineffective in failing to properly object to the calculated drug quantities.

3.  Government failed to provide a reliable factual basis to demonstrate Collins actually engaged in a drug trafficking conspiracy.

4.  Defense counsel was ineffective in failing to file an appeal in the face of Collins' expressed desire to appeal.  Note no specific appealable issues are cited.

5.  Counsel was ineffective at sentencing in failing to raise the issue of disparity in sentencing between defendant Collins and his co-defendants.

6.  Collins' sentence was in violation of the Constitution and laws of the United States.

**A.   FAILURE OF COUNSEL TO COMMUNICATE TO THE GOVERNMENT HIS DESIRE TO BE A COOPERATOR**

For obvious reasons, for the government to be able to address this claim, it was necessary to obtain a waiver, or an order that the attorney client privilege should be deemed waived, with respect to discussions between Collins and his attorneys dealing with Collins' alleged desire to cooperate with the government, counsel's failure to communicate that desire to the government, and his desire to file an appeal.  The government sought and obtained an order that defense counsel must respond to narrowly tailored discovery addressing instructions to defense counsel and advice given by defense counsel.   Interrogatories were served on defense counsel and on May 5, 2020  Collins' former counsel submitted responses provided under penalty of perjury.   Those responses unambiguously and unequivocally demonstrated his claims to be false.

The first three interrogatories asked about whether Collins ever raised the issue with his counsel about being a cooperator.  The response provided by one of his attorneys, Anthony Willoughby, II was as follows:

> Kenneth Collins never informed me that he wanted to enter into a cooperation plea agreement with the United States.  During a conversation while visiting Mr. Collins in the West Valley Detention Center, Mr. Collins informed me that he believed a fellow inmate who was in state custody had confessed to an offense to Mr. Collins.  Mr. Collins then asked me if I thought reporting that information would help Mr. Collins in his case with the United States.  I informed him that illegal activity is how people end up in prisons, but I did not believe a state custody matter would help him with his federal case."

His other attorney, Anthony Willoughby provided the following answer to the interrogatory inquiring about Collins' alleged desire to cooperate with the government:

> No. Kenneth Collins only proffer was to inform on a state custody individual that was in custody at West Valley Detention Center.  He never individuated that he wanted to cooperate with the Government.  In fact, after the Court proceeding wherein he entered his plea, I approached him and asked if anyone else was involved because the Court had expressed a keen interest in ascertaining said information.  Mr. Collins response was negative.

During the change of plea Mr. Collins was specifically asked if he were satisfied with the representation his lawyers had provided him, to which he responded, under oath, in the affirmative.   There was plenty of opportunity for him to have brought to

the Court's attention that he was dissatisfied with the way his defense was proceeding.   Yet 15 months later, after ample time to have reached out to the government and make his offer to cooperate in the hope of gaining relief under Rule 35 of the Federal Rules of Criminal Procedure, he returns to Court with the claim that this long-held and urgent desire to cooperate with the government was negligently not communicated by his attorneys. That scenario simply defies common sense and the record.   It is evident to this court that Collins is unfettered by any sense of obligation to stick to the facts or the need to tell the truth, or at least not make flagrant misrepresentations to the court.   He will say literally anything, forgetting, apparently, that there is a record of all matters of note in a criminal proceeding.

In his Reply, Collins complains that his attorneys version of events should not be given any weight greater than his own.   He notes that they have a desire not to be adjudged inadequate in their representation of a client, and arguably motivated to be less than truthful.   The Court has two observations:   Not only have they provided their version under oath, but they are officers of the court and face contempt charges for making a direct and intentional misrepresentation to the Court on a material matter.   Second, Collins himself has perhaps a greater incentive to have his version believed.   His freedom hangs in the balance.   And while he contends that his version is supported by circumstantial evidence, he points to none and the Court is aware of nothing other than Collins' self-serving statements in his unverified motion. Moreover, he has made statements in this very motion which call into question his credibility.   That is separate and apart from his conduct as a deputy sheriff which casts a dark shadow over his character generally.   However, for purposes of assessing the credibility of Collins and his attorneys the Court will confine itself to information

obtained in the course of addressing this motion.   Relative credibility will be demonstrated as the Court addresses the balance of his claims.

        1.   Collins' Allocution.

On the one occasion where the issue of cooperation came up, was not at the change of plea hearing, but at the sentencing hearing.  As is required by law, Collins was given the opportunity to allocate.   Presumably, this would have been his opportunity to illuminate the Court on the point that he thought a miscarriage of justice was about to occur.  Here is what he had to say:

> The first meeting that I had with my attorney, I let it be known that I wanted to speak directly to the U. S. Attorney's Office or the FBI or anybody that wanted to talk to me and get answers about, you know, everything that went on between me and the confidential informant.  As a matter of fact, even after my sentence, I will still be available if anyone chooses to come and speak to me about any and everything that has to do with that.   That has been my position since the beginning.  I have never tried to fight this case at all. (Trans of Sentencing Hrng 11-19-18 DE-152, pp.24-25.) (Court's emphasis.)

Collins offered to discuss everything that went on between he and the confidential informant.  All of that was recorded and the government did not need his assistance as it pertained to those discussions.   It seems clear that the "cooperation" Collins envisioned had nothing to do with other cases or people outside of himself, Valencia and Easter as pertains to their involvement in this case. Not meaning to speak for the government, what he was offering wasn't much.  The government already had the three of them and had Collins' conversations recorded. Moreover, all three of them were arrested at the locations agreed to, each in a separate vehicle and at least Collins, was armed and carrying his deputy sheriff

credentials, as was agreed.   He was already gift wrapped.   No cooperation was necessary in this case.  It does not appear that he was prepared to offer information on other individuals or other crimes.  Therefore, this entire claim of error about not pressing the government on his offer to cooperate is much ado about nothing.

Though not terribly relevant, other than the fact Collins mentions it every chance he gets, the Court had no interest in whether he cooperated or not.  The Court was interested in whether Collins was using Emerging Leaders Academy as a source from which to recruit people into his drug transport security scheme. Emerging Leaders Academy is a program sponsored by the Los Angeles Sheriff's Department aimed at ex-cons, addicts, drop-outs and the hopeless.  The Academy restores hope, gives the participants the tools necessary to deal with their addictions, puts them on the path to completing their education, provides job training, gives them the incentive to turn their backs on their gangs and restores a sense of optimism.  They reportedly have a 1% recidivism rate, an enviable record for any re-entry program.

This was the subject the Court was intensely interested in.   Not Collin's cooperation.  The Court was interested in learning if Collins, an instructor in the Academy, was using his position and the vulnerability of the participants, to staff his criminal enterprise.  In his papers, Collins has invented an entire conversation, which included the prosecutor, which simply did not happen.  In Collins' version, the topic of discussion was his amenability to entering into a cooperation agreement.  Nothing could be further from the truth.  Hopefully, this puts this matter to rest.

## B. Failure to Object To How The Drug Quantities Were Calculated

Collins   plead   guilty   to   the   charge   of   *conspiracy*   to   distribute methamphetamine, cocaine and marijuana.   The quantities were discussed and

agreed upon and Collins set his fee based on that understanding.   On January 5, 2018, Collins and UC-1 met again to discuss details for the transport scheduled to take place on January 16, 2018.   During the *recorded* meeting, <u>UC-1 told Collins that the cargo would contain 20 kilograms of cocaine, six kilograms of methamphetamine, and cash.</u>  Collins said that his "guys" are used to providing security for "bigger loads" and asked UC-1 about the possibility of doing even larger drug transports in the future. Collins and UC-1 then discussed increasing the size of the January 16, 2018, transport and filling a "moving truck."  Collins told UC-1 that his price tag, in light of the greater drug quantity, would increase to as much as $250,000.  (PSR ¶¶ 28-35.)

It is the law that a conspiracy is complete once agreement has been reached and an overt act is taken by a member of the conspiracy to further the agreement. *(U.S. v. Mincoff,* 574 F.3d 1186, 1192-93  (9th Cir. 2009).

Then, of course, are the admissions in the Plea Agreement.   Specifically, Paragraph 5 which provides in part: "Defendant admits that defendant, in fact, conspired to distribute at least 50 grams of methamphetamine and at least five kilograms of a mixture and substance containing a detectable amount of cocaine, as described in count one of the indictment."

Lastly, at the August 13, 2018 change of plea proceeding, Collins himself orally admitted, in open court, to the quantity of drugs he had conspired to transport.

THE COURT:  It is alleged in the indictment that you are responsible for trafficking approximately six kilograms of methamphetamine and 50 kilograms of cocaine -- no, 20 kilograms of cocaine.  With respect to the amount of narcotics charged against you, you have a right to have the finder of fact make a determination as to the total amount of drugs for which you are responsible.  Do you give up the right to have a jury make the determination that, in fact, you are

responsible for trafficking approximately 20 grams of cocaine and -- I'm sorry, 20 kilograms of cocaine and approximately six kilograms of methamphetamine?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  You admit that the drug offenses to which you are pleading involved a quantity of drugs approximately 20 kilograms of cocaine, and six kilograms of methamphetamine?

THE DEFENDANT:  Yes, Your Honor.

Given that Collins admitted in the written plea agreement and again orally at the change of plea hearing as to the amount of drugs he was responsible for, its more than a little specious for him to charge his attorney with professional negligence for not objecting to the amount of drugs charged in the indictment.  Did he want his attorney to object to his oral admission, in open court,  as to the amount of drugs as charged in the indictment?  Is he suggesting that his attorney should refute the admissions he had made that were incorporated into the written agreement he had signed?  Is he suggesting that his attorney should have literally blown up the plea agreement, and with it the dismissal of two 924(c) charges worth a consecutive 10 years in prison? Besides, the drug quantities were discussed and agreed to in recorded conversations between Collins and UC-1.  Counsel is not required to raise frivolous objections that fly in the face of the evidence.  Not if he is to maintain any credibility with the court.

C.    **GOVERNMENT FAILED TO PROVIDE A RELIABLE FACTUAL BASIS TO DEMONSTRATE COLLINS ACTUALLY ENGAGED IN A DRUG TRAFFICKING CONSPIRACY.**

Again, Collins himself provides the evidence to show the absurdity of this contention.  Turning once again to the written plea agreement, which Collins stated he read, discussed with his attorney and signed, contained the following paragraph:

Defendant understands that for defendant to be guilty of the crime charged in count one, that is, Conspiracy to Distribute Methamphetamine, Cocaine, and Marijuana, in violation of 21 U.S.C. § 846, the following must be true:

a. There was an agreement between two or more persons to distribute methamphetamine, cocaine, and marijuana; and

b.  Defendant joined in the agreement knowing of its purposes and intending to help accomplish those purposes."  (Plea Agreement, ¶ 4, [DE-78].).

Further, paragraph 17 of the Plea Agreement provides in part: "Defendant understands that this waiver includes, but is not limited to, [ . .  .] all claims that the statement of facts provided herein is insufficient to support defendant's plea of guilty." (See Plea Agrmt. ¶17, DE-78:16.)

Later in the change of plea hearing, the government provided a narrative of all the facts the government was prepared to prove at trial.  The Introduction, Part I of this Order contains an abbreviated summary of those facts.  The government also recited uncharged conduct from 2014 where Collins, in his marked patrol vehicle, executed a traffic stop on a vehicle he knew contained a a large amount of cash. Collins took the cash, totaling approx. $160,000 and made no report of the traffic stop nor the seizure of the cash.  At the end of the government's statement of facts they intended to prove at trial, the following exchange took place between the Court and Collins:

THE COURT:   All right.   Mr. Collins, did you understand everything the prosecutor just said?

THE DEFENDANT:  I did, Your Honor.

THE COURT:  Are you pleading guilty because you did the things charged in the indictment?

1    THE DEFENDANT:  Yes, Your Honor.

2    THE COURT:  Are you pleading guilty because you are guilty?

3    THE DEFENDANT:  Yes, Your Honor

4    (Transcript of hearing of August 13, 2018, DE-98, pp. 26-36.)

5
6    D.    **DEFENSE COUNSEL WAS INEFFECTIVE IN FAILING TO FILE AN APPEAL IN THE**
7          **FACE OF COLLINS' EXPRESSED DESIRE TO APPEAL.**

8    This allegation is perhaps the least meritorious.  It fails to even specify,

9    however specious they might be, any specific appealable issues, that were not

10   expressly waived in the plea agreement.  More important is the fact that his attorney

11   has provided interrogatory responses, under oath, that filing an appeal was never

12   discussed,  That may be due, at least in part, to the fact that his right to appeal had

13   been expressly waived as part of his plea agreement.   Specifically, the plea

14   agreement provided that Collins expressly waived his right to appeal his sentence if

15   the court imposed a term of imprisonment of no more than 235 months on all counts

16   of conviction.  (See Plea Agrmt. ¶18, DE-78:16.) In any event, if this comes down to

17   the credibility of Collins versus his former lawyer Willoughby, the advantage goes to

18   the lawyer who provided his statement under oath.  Also under oath was Collins at

19   the change of plea hearing where he admitted everything he is now contesting. To

20   put it politely, this claim flies in the face of the admissions he made to the Court in

21   the change of plea hearing and is fanciful at best.

22
23   E.    **COUNSEL WAS INEFFECTIVE AT SENTENCING IN FAILING TO RAISE THE**
24         **ISSUE OF DISPARITY IN SENTENCING BETWEEN DEFENDANT COLLINS AND**
25         **HIS CO-DEFENDANTS.**

26   18 U.S.C. § 3553(a)(6) obligates the Courts to consider and to recognize "the

27   need to avoid unwarranted sentence disparities among defendants with similar

28

15

records who have been found guilty of similar conduct."   First, Collins was sentenced three months after Valencia and two months before Easter.  Therefore, his attorney only had co-conspirator Valencia to compare Collins to, however, they were in disparate circumstances for comparison purposes.  It would have been impossible for his attorneys to argue sentencing disparities between Collins' sentence and the sentence not yet imposed on his co-defendant Easter.

Secondly, the operative word is "unwarranted." As we explained in *Rita,*[551 U.S. 338 127 S.Ct. 2456, (2007).] a district court should begin all sentence proceedings by correctly calculating the applicable Guidelines range. See 551 U.S., at 347 – 348, 127 S.Ct. 2456. As a matter of administration and to secure nationwide consistency, the Guidelines are the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the 18 U.S.C. § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. See *id.,* at 351, 127 S.Ct. 2456. He must make an individualized assessment based on the facts presented. [ . . . ] *Ibid.,* 127 S.Ct. 2456; *Gall v. U.S.,* 552 U.S. 38, 49-50,128 S.Ct. 586 (2007*).*

It is not enough that the sentences vary between co-conspirators. The variance must be supported by consideration of the statutory factors enumerated in 3553(a). The Court must give consideration to the history and characteristics of the defendant and the nature of the offense, among others.   Collins was the leader of this enterprise, therefore he shouldered greater culpability.   He was also a sworn law enforcement officer who violated his oath of office and the peoples' trust.  Lastly, he

used his position with the Sheriff's Department's Emerging Leaders program to entice ex-cons back into a life of crime, just to help him accomplish his selfish goals. And with respect to Easter, they had had a long friendship. Easter had sometime earlier fallen on hard times and Collins was there to assist. Easter felt obligated to Collins and Collins took advantage of that fact by pulling him into his scheme. It is interesting to note that co-defendant Valencia was paid $2,000 for the January job and Easter was paid nothing. By any standard, and certainly under the 3553(a) factors, he was deserving of a more lengthy sentence than his co-defendants. It is also notable that the guidelines range for both Easter and Valencia were lower that the range for Collins.

**F.** **COLLINS' SENTENCE WAS IN VIOLATION OF THE CONSTITUTION AND LAWS OF THE UNITED STATES.**

Collins' argument is predicated on the principle that one cannot be convicted of conspiracy when he "conspires" only with an agent of the government. *U.S. v. Escobar de Bright*, 742 F.2d 1196, 1199 (9th Cir.1984). He is apparently taking the position that here, he conspired only with the undercover FBI special agent (UC-1) and therefore there was no agreement or meeting of the minds to distribute controlled substances. UC-1 was intent on thwarting a crime and Collins, Easter and Valencia were motivated to successfully complete the distribution of controlled substances. That being the case, his conviction is invalid and his sentence must be vacated. He mischaracterizes what occurred in this case.

A conspiracy is defined as an agreement between two or more people to commit an unlawful act, *see, e.g., Iannelli v. United States,* 420 U.S. 770, 777, 95 S.Ct. 1284, 1289, 43 L.Ed.2d 616 (1975); *United States v. Falcone,* 311 U.S. 205, 210, 61 S.Ct. 204, 206, 85 L.Ed. 128 (1940); *United States v. Abushi,* 682 F.2d 1289, 1293 (9th Cir.1982); *United States v. Andreen,* 628 F.2d 1236, 1248 (9th Cir.1980), which arguably requires some form of a "meeting of minds," *Krulewitch v. United States,*

336 U.S. 440, 448, 69 S.Ct. 716, 720, 93 L.Ed. 790 (1949) (Jackson, J., concurring). There is neither a true agreement nor a meeting of minds when an individual "conspires" to violate the law with only one other person and that person is a government agent." *Escobar de Bright*, 742 F.2d 1196, 1199 (9th Cir.1984).

Here Collins collaborated with more than UC-1 the undercover FBI special agent.  He also conspired or reached agreement with co-defendants Easter and Valencia, to provide security for the transport of large quantities of drugs to Las Vegas. On the day of the Las Vegas run, the three conspirators arrived at the pre-determined meeting place in Pasadena prepared and intending to escort a large truck loaded with drugs to Las Vegas.  Therefore, like his other claims of error, this too, is frivolous and is rejected.

## G. REQUEST FOR EVIDENTIARY HEARING

Under section 2255, an evidentiary hearing must be granted "[u]nless the motion and the files and record of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255; *Shah v. U.S.* , 878 F.2d 1156, 1158 (9th Cir. 1989)

Where a section  2255 motion is based on alleged occurrences outside the record, no hearing is required if the allegations, "viewed against the record, either fail to state a claim for relief or are 'so palpably incredible or patently frivolous as to warrant summary dismissal.' " *Marrow v. United States,* 772 F.2d 525, 526 (9th Cir.1985) (*Marrow* ), *quoting United States v. Schaflander,* 743 F.2d 714, 717 (9th Cir.1984), *cert. denied,* 470 U.S. 1058, 105 S.Ct. 1772, 84 L.Ed.2d 832 (1985); *see also Watts v. United States,* 841 F.2d 275, 277 (9th Cir.1988) (*Watts* ); *Baumann v. United States,* 692 F.2d 565, 571 (9th Cir.1982) (*Baumann* ).

Here, Collins makes a number of assertions to establish that but for certain occurrences, he would not have entered a plea of guilty.  First, he claims that he

advised his attorney that he was desirous of cooperating with the government and advised his attorney that he was interested in a cooperation agreement.  That agreement, were it to have come to pass, had the potential of earning him a reduction in his guidelines sentence under section 5K1.1 of the Sentencing Guidelines.  Obviously, there is no guarantee Collins would have discharged all of his obligations under such an agreement, or that the government would have found his information of use in the prosecution of another person or that the Court would have agreed with the government's recommendation for a downward departure or the extent of that departure.  However, his attorney has provided a sworn statement that the only discussion of providing information against another person was an individual who was already in state custody.  But most damaging is Collins' own words at the sentencing hearing where he admitted that he was interested in speaking with the USAO or the FBI about his involvement with UC-1.  He did not mention any other individuals not involved in the transport security scheme for which he was arrested and indicted.  However, in this motion, he seeks to imply that was his intention.  However, his attorneys say otherwise, and most importantly, at the time, so did he.  It is now, long after the fact, that he says otherwise.  It is not credible and the Court rejects this claim of error.

He also complained that his lawyer ignored his request that an appeal be filed.  As noted above, pursuant to the literal terms of his plea agreement he could only challenge his conviction on the grounds that his guilty plea was involuntary, a claim he has not raised in his 2255 motion and something he disavowed several times, under        oath        at        the        change        of        plea        hearing .  In addition, his right to challenge any aspect of his sentence or how it was calculated on appeal was foreclosed because he was sentenced to a term of less than

235 months.  By the literal terms of the written agreement, he expressly waived his right to appeal his sentence or how it was calculated so long as his total term of imprisonment was 235 months or less. Interesting to note, he does not state what grounds he wanted his lawyers to pursue on appeal.  The Court concludes that Collins is using the mechanism of a 2255 motion as a substitute for an appeal, which he has waived.

The Court has given the claim "'careful consideration and plenary processing," *Watts v. United States,* 841 F.2d 275, 277 (9th Cir.1988) *quoting ,* and expanded the record by means of limited discovery on the disputed questions presented.  The Court has also made a credibility determination based on the expanded record. In any event, it is not clear to the Court what purpose is to be served by an evidentiary hearing.  There are competing versions of two events.  The Defendant's and his former attorneys'.  In the Court's view, Defendant has damaged his credibility by making the unsupported and completely false claims in the instant motion.  For example, Collins has stated in his papers that "the Court brought up the issue of Movant cooperating during the change of plea hearing to which the attorney for the government responded that she was never contacted by defense counsel on the matter. (Mtn to vacate, etc., p.4.) (1). The Court has no recollection of such a statement.  (2) The Court has never made such an inquiry of a defendant or the government, in any case. (3) It would have been entirely improper for the Court to interject itself into efforts to resolve a criminal case.  (4) The government was in possession of the recorded statements where Collins claimed to know of other crooked cops and therefore  could have initiated discussions regarding cooperation. (5) a careful review of the transcript of the change of plea hearing confirms that no such comment(s) were made by the Court. (6) Collins has made no post-sentencing

overtures to the government in pursuit of Rule 35 relief by offering to cooperate with the government. The Court has resolved the credibility conflicts in favor of the version of events sworn to by counsel, therefore, no evidentiary hearing is necessary.

## IV.   CONCLUSION

The Court finds Collins  has not raised plausible grounds for a sentence correction or that his sentence be vacated or set aside.  Indeed, the Court is satisfied that the expanded record conclusively demonstrates he is entitled to no relief.  All disputed factual issues have been resolved adverse to Collins.  In *United States v. Shah* the defendant filed a 2255 motion contending inadequacy of counsel due to purported assurances by counsel, in the absence of which he would not have plead guilty.   Evidence did not support defendant's contention that his trial counsel informed him that if he pleaded guilty, the court would not consider defendant's prior convictions in sentencing.     Because Shah's later allegations about his conversations with defense counsel contradicted Shah's previous statements in court, it was necessary to assess his credibility. The Ninth Circuit stated "[w]e have recognized that where the issue of credibility can be ' conclusively decided on the basis of documentary testimony and evidence in the record,'  no evidentiary hearing is required." *United States v. Espinoza,* 866 F.2d 1067, 1069 (9th Cir.1989) (*Espinoza* ), *quoting Watts,* 841 F.2d at 277. Here, the Court has examined the transcript of the change of plea hearing and the sentencing hearing, its own notes and recollection of those hearing and the sworn interrogatory responses of his two attorneys.

///
///
///
///
///
///

Based on the totality of the evidence before it, the Court finds it has been conclusively established the Collins is entitled to no relief and therefore an evidentiary hearing is not necessary.  Moreover, there has been no substantial showing of a  deprivation of a constitutional right. *Slack v. McDaniel,* 529 U.S. 473, 483-484  (2000).

IT IS SO ORDERED.

DATED:    August 17, 2020.

_____
OTIS D. WRIGHT,II
UNITED STATES DISTRICT JUDGE